SMITH *v.* JACKSON.

CANCELLATION OF INSTRUMENTS—DEEDS—EVIDENCE—SUFFICIENCY.
   In a suit by an aged, infirm, and crippled woman to set aside a deed to her daughter and son-in-law, on the ground that said deed was executed in consideration of their oral agreement to care for her, and that they had failed to

Cancellation of Instruments, 9 C. J. § 195.

do so, evidence *held*, sufficient to establish her right to the relief prayed for.

Appeal from Muskegon; Vanderwerp (John), J. Submitted April 14, 1927.    (Docket No. 110.)    Decided June 6, 1927.

Bill by Charlotte Smith against George Jackson and another to set aside a deed.    From a decree dismissing the bill, plaintiff appeals.    Reversed, and decree entered for plaintiff.

*John G. Anderson,* for plaintiff.

*Willard G. Turner, Jr. (Raymond J. Engle,* of counsel), for defendant George Jackson.

STEERE, J.    Plaintiff appeals from a decree of the Muskegon circuit court, in chancery, refusing to set aside her deed conveying realty to defendants who were then husband and wife, the latter being plaintiff's daughter.    At that time they were living with and caring for her in her own home.    The value of this realty does not appear, but it was all plaintiff owned.    It is described in her deed to defendants, executed on August 24, 1922, as follows:

"The south half ($\frac{1}{2}$) of the northwest quarter ($\frac{1}{4}$) and twelve (12) acres off the west half ($\frac{1}{2}$) of the west half ($\frac{1}{2}$) of the northwest fractional ($\frac{1}{4}$) of section (1) one; also the north half ($\frac{1}{2}$) of the southeast quarter ($\frac{1}{4}$) of the northeast fractional ($\frac{1}{4}$) of section (2) two, all in town twelve (12) north, range eighteen (18) west; also lot eight (8) of block two hundred fifty-two (252) of the revised plat of the city of Muskegon, Michigan.    The said party of the first part retains the use of said premises and the rents and profits thereof during her natural life."

About two years later defendants separated and were subsequently divorced.    At the time of this trial Rose Jackson had disappeared.    Her whereabouts was

unknown to plaintiff and is not disclosed. George Jackson remarried shortly after Rose had obtained a divorce from him, and lived with his second wife in plaintiff's home until early in 1925. She had owned this place for many years. It was a comfortable home with modern conveniences, "furniture and bath and all those things."

Plaintiff alleges in her bill that she was crippled and infirm at the time of executing the deed, and defendants then promised to care for, maintain, and treat her kindly during her lifetime, and in consideration of their promises she executed the deed in controversy. Her alleged grounds for setting it aside are that subsequent to making it defendants became unkind, abusive, left her home, and failed to support her.

Defendants made separate answers by separate attorneys, each denying plaintiff's charges of cruel treatment or making promises to support her, averring the deed was a voluntary act on her part. Defendant George Jackson further avers that plaintiff later willed him the balance of her property, in December, 1924, and made him the beneficiary of a life insurance policy the following month, attaching a copy of the will and policy to his answer.

Rose Jackson was not present at the hearing. Owing to her age and physical condition, plaintiff's testimony was taken by deposition and read at the hearing, counsel for the defense making no objection, as he had attended the taking of her deposition and cross-examined her.

It appears from the record that defendants quarreled and separated some time in October, 1924, and about the same time both left defendant alone in her home uncared for. George left first. His reason for going is: "Rose got so bad after a while that I didn't care to live with her any longer, and we separated." Rose

left soon thereafter. Where she went or what she did is not disclosed. Plaintiff testified that while she was living with defendants in her own home after they had secured the deed from her their attitude towards her changed; they neglected to properly care for her, were unkind and cruel, heaped indignities upon her in various ways; on one occasion pulled her out of bed between 4 and 5 o'clock in the morning, dragged her over the furnace register, cutting her face and arms and abusing her in other ways, until she fled to the neighbors. Her testimony is not at all times entirely clear or harmonious, but her story may fairly be said to condense in substance to the following excerpts from it:

"They didn't support me; I supported them. I had enough property other than that which I conveyed to them, so they could live on my hands. * * * After the deed was signed he didn't behave himself. I and George got along well before the deed was signed. It was about 30 days after this deed was obtained that Rose, my daughter, and George here, dragged me out of the bed. * * * They kept treating me worse and worse after that. They got all the money out of me."

After defendants had separated and left plaintiff's home, Rose Jackson never returned to care for or live with her mother. George later returned, as he states, to see that plaintiff was cared for. This was followed by plaintiff resuming friendly relations with him. He established his home with her and brought a woman there as housekeeper. It was during this period she signed a will giving him all her property and designated him as beneficiary of a $750 life insurance policy. Shortly after that was done, George married the housekeeper and with her lived in plaintiff's home and cared for her until some time in March, 1925.

George's second wife was a divorced woman, as to whom there is testimony tending to show he was un-

duly intimate before he married her.    Soon after his second marriage he and his second wife concluded to get out of that neighborhood, and she commenced looking for rooms to rent elsewhere, visiting one on Peck street some distance from plaintiff's home.    Some time later they rented the Peck street rooms and moved there, taking plaintiff with them, where she was given a small room upstairs with a sanitary cot to sleep on because her room would not accommodate a large bedstead.    She found, as she claims, both her accommodations and treatment there intolerable.    A few days later she left there and returned to her own home, sending for her son, Mathew Smith, who had been absent from Muskegon for some time, to come there and live with her.    He testified that he had always been friendly with his mother, and she got him to go there because "she had nobody to support her." In compliance with her request he had lived there since, saying:

"My mother needs the care of somebody.    She is an old woman and a cripple.    She is not doing anything for me or paying me for taking care of her. I am supporting her."

In dismissing plaintiff's bill, the trial court said, in part:

"I am of the opinion that the plaintiff is not entitled to a decree.    I am satisfied that she voluntarily made the deed with full knowledge of the situation.    I am satisfied that the plaintiff has not made out any cruel treatment on the part of the defendants toward her. * * * The burden of proof is on the plaintiff to establish her case, and she has failed in doing so."

Conceding, as the court found, that she voluntarily made the deed with full knowledge of the situation as conditions then were, we are unable to agree in the conclusion that she had shown no cruel treatment on the part of defendants and failed to establish her case.    On August 24, 1922, when she executed the

deed to defendants she was 77 years of age, crippled and infirm, living in her own home of many years, with her own daughter and her husband, who at that time were apparently kindly caring for her.    In her physical condition and at her time of life continuation of such care and assistance was an imperative consideration.    Under then existing conditions it was but a natural impulse for her to desire and seek to secure continuation of such services and association.    Such facts are strongly confirmative of her claim that she then deeded to defendants her home and other described property in consideration of their promise not to leave her, but continue to live with her in her old home, care for and support her during the few remaining years of her life.    That they did not do so is undisputed.

Her testimony that, after obtaining this deed, their treatment of her until they left was unkind and cruel is only disputed by defendant George Jackson, and he gives as his reason for deserting plaintiff's home that Rose got so bad he could not, or would not, live with her any longer.    Her testimony as to their cruel treatment is also supported by that of John and Jennie Laurin, disinterested adjoining neighbors, who testified to hearing defendants, especially Rose, curse, call vile names, and abuse plaintiff; and on one occasion she came over to their place "in a bloody condition" as the result of trouble she had with defendants.    Mrs. Laurin testified that plaintiff was in such condition that she put her in bed after washing her hands; her arm, face and hands had been scratched, one side of her face being "discolored, black and blue."    Plaintiff also testified of this occasion, and that the marks of physical injury she then bore were the result of defendants' maltreatment of her.

Aside from the conflicting testimony, there are certain outstanding and significant undisputed facts

in connection with other facts conclusively shown. Plaintiff deeded to defendants in her old age and crippled condition all the realty she owned and everything she had except perhaps a small amount of personal property for a nominal consideration of $1, without anything in writing given her in return. The deed only reserved to her a life estate, necessarily of scant money value at her time of life and then condition, only valuable to her as a place in which to live. The thought is impelling that there must have been some further consideration. Whatever it might have been was oral. Neither in the deed nor proofs in the case is there any provision as to payment of taxes, insurance on the property, keeping the premises in repair and other essential matters in a transaction of that kind. We are of opinion the testimony fairly shows that she was induced to give this deed in consideration of their promise to care for and support her in her old age; that after obtaining the deed she was unkindly treated by them, difficulties between themselves and plaintiff ending in their deserting the premises and breaching their contract. The deed ran to defendants as husband and wife. The obligation rested alike upon both of them. In this they both emphatically failed. George's subsequent efforts in connection with his second wife to establish his personal right to the property under the deed in question does not relieve the situation. In that effort he also defaulted.

That plaintiff was led to make a will in his favor and nominate him as beneficiary in her life insurance policy is of little significance here beyond its bearing upon her condition and testimony, it being within her power to change those provisions as she sees fit. It but indicates she was so grateful to him at that time for his return and promises that she was willing to make such further effort to obtain care and mainte-

nance in her own home.   But that was followed by his deciding to go elsewhere with his new wife and offering to take plaintiff with them, to which she at first yielded until she found conditions intolerable and returned to her own home where she had a right to be cared for and supported by defendants.   The conditions shown are in certain respects closely analogous to those in *Lockwood* v. *Lockwood*, 124 Mich. 627.

The decree heretofore granted will be set aside, and a new decree may be entered herein as to the real estate in accordance with the prayer of her bill, with costs to plaintiff.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, and MCDONALD, JJ., concurred.   CLARK, J., did not sit.